UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

In the Matter of the Extradition of )
                                     )          3:20-mc-00068
Piotr Jan Grabowski a/k/a "Walerek"  )

## MEMORANDUM OF EXTRADITION LAW
## AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS

In this extradition proceeding, the United States, in fulfillment of its treaty obligations to the Government of Poland, seeks a certification that Piotr Jan Grabowski a/k/a "Walerek" ("Grabowski"), is extraditable under the extradition treaty between the United States and Poland (the "Treaty").[1]   The United States respectfully submits this memorandum, which provides a brief overview of the law that governs extradition proceedings, including, in particular, bail determinations.  In short, Grabowski should be detained pending the extradition hearing in this matter, and thereafter if the Court enters an order finding him extraditable, because he cannot overcome the strong presumption against bail in international extradition cases.  Specifically, he cannot meet his burden of showing that he poses no risk of flight or danger to the community, and that special circumstances warrant his release.

## BACKGROUND

According to information the Government of Poland has provided:

On October 3, 2001, the Provincial Court in Rzeszów, Poland, convicted Grabowski of (1) rape, in violation of Article 197 § 3 of the Polish Penal Code; and (2) participating in a brawl

---

[1] *See* Extradition Treaty Between the United States of America and the Republic of Poland, U.S.-Pol., July 10, 1996, S. TREATY DOC. NO. 105-13 (1997) and Agreement Between the United States of America and the Republic of Poland on the application of the Extradition Treaty Between the United States of America and the Republic of Poland signed 10 July 1996, U.S.-Pol., June 9, 2006, S. TREATY DOC. NO. 109-14 (2006) (together, the "Treaty").  Exhibit 1 to the Complaint includes a copy of the Treaty.

or beating leading to injury, in violation of Article 158 § 1 of the same Code; sentenced him to 2 years and 6 months imprisonment; and credited to the penalty time Grabowski had spent in custody from May 17, 2001, to October 3, 2001.  On December 20, 2001, the Court of Appeals in Rzeszów affirmed the judgment.  On May 19, 2003, after Grabowski failed to appear at the penal institution to serve his sentence, the Provincial Court in Rzeszów issued a warrant for his arrest.

The victim (the "victim") told Polish police the following:  On May 16, 2001, in Stare Miasto, she was returning home from shopping.  She saw Piotr Jan Grabowski and Ireneusz Zagaja ("Zagaja").  The two men, who appeared to be under the influence of alcohol, asked her to stop by for a while and to get off her bike.  When the victim went along with this, the two men took away her bike and went toward Grabowski's house.  The victim followed the men because she wanted to get the bike back, as it belonged to her friend.  They reached an unfinished residential building on Grabowski's property, where they sat on a little wall and smoked cigarettes.  At one point, the two men grabbed the victim by the arms, dragged her into a room on the landing level of the house, started to undo her bra, put their hands under her clothing, and told her she was the sexiest girl in Stare Miasto.  Zagaja asked Grabowski to leave the room, which Grabowski did for a while. Zagaja removed the victim's sweater.  The victim resisted, pushing Zagaja against the wall, crying, and screaming.  Zagaja called for Grabowski, who came back into the room and closed the door. The two assailants tried, initially without success, to knock the victim over onto a bed.  Grabowski told the victim that they would allow her to leave only after she performed oral sex on them, and he started to unzip her trousers.  The victim ran to the window and called for help.  Zagaja hit the victim, which caused her head to hit the wall.  The assailants pushed the victim onto the bed. Zagaja held the victim's arms, and Grabowski sat on her abdomen.  Grabowski put his penis into

2

the victim's mouth, and Zagaja put his penis in the victim's palm.  The victim tussled and, when

Grabowski removed his penis from her mouth, screamed.  Grabowski hit the victim in the face and

told her nobody would hear her.  Zagaja put his fingers inside the victim's vagina, commenting

that perhaps this would satisfy her more quickly.  The assailants laughed and got up from the

victim's body.  The victim put on her clothing, leaving behind her watch and underwear because

she wanted to leave quickly.  Grabowski blocked her way and said he would let her leave only

after he ejaculated.  Although the victim managed to exit the room, Zagaja dragged her to the

bathroom and started unzipping her trousers.  When Grabowski opened the bathroom door slightly,

the victim tried to escape.  Grabowski grabbed the victim's sweater and tore it.  Eventually, the

victim escaped the house, took the bike, and rode home.

Police later found the victim's watch and underwear in the room.

The victim's mother told police that when the victim reached home, the victim's clothing

was torn, and she was crying and in great distress.  The victim told her mother that Grabowski and

Zagaja had dragged her to the newly built house and used physical force to assault her sexually.

A medical exam the day after the assault indicated that the victim suffered injuries

including bruising to the right shoulder with palpable pain, edema in the occipital area with

palpable pain, bruising to the left arm, pain in the sternum, and a bruise on the right thigh.

Although Grabowski initially denied having close physical contact or oral sex with the

victim on the date in question, he later stated, in July 2001, that he became overwhelmed with

desire when he walked into the room where Zagaja and the victim were present, and claimed that

that victim willingly performed oral sex on him after declining traditional intercourse.  Grabowski

did not explain how the victim sustained physical injuries, why her clothing was ripped, and why

3

she abandoned her watch and underwear in the room where the incident occurred.

The Provincial Court credited the victim's aforementioned statements, reasoning that
(1) the victim spoke with police in close proximity to the incident, a mere one day afterwards
(and, in fact, several times); (2) the victim made these statements despite the doubt she expressed
about whether to move to prosecute the assailants, whom she had known for years and with
whom she had been friends; (3) these statements were consistent with what the victim told her
mother after the assault, the victim's documented physical injuries, the distress and torn clothing
the victim's mother observed immediately after the incident, the victim abandoning her watch
and underwear at the scene, and Grabowski's eventual admission to having oral sex with the
victim; and (4) Grabowski's denials were not credible because he changed his story and could
not account for the victim's injuries and torn clothing.  The Provincial Court also noted that the
victim had known the defendants for years, that Grabowski's family had asked her to recant, and
that Grabowski's family had given her money.

On December 20, 2001, the Court of Appeals in Rzeszów affirmed the October 3, 2001,
judgment of the Provincial Court in Rzeszów, which Grabowski had appealed.  Thereafter,
Grabowski fled Poland and failed to report to the penal institution to serve his sentence.  He did
not collect a summons, which was mailed to him, directing him to report to a penal institution; it
appeared from the post notes that Grabowski had left the country.[2]  On May 19, 2003, the

---

[2] On January 17, 2002, the court issued an order directing the police to compel Grabowski to
appear at the penal institution.  On February 21, 2002, Polish police informed the court that
Grabowski had not answered the summons because, to their knowledge, it appeared he no longer
lived at his residence and likely had fled the country.  On July 12, 2002, by court order, a "wanted"
notice issued for Grabowski.  On August 7, 2002, Grabowski's counsel moved to defer
enforcement of Grabowski's sentence.  On September 10, 2002, the court granted a six-month
sentence deferral, to April 11, 2003.  On April 24, 2003, the court sent Grabowski another

Provincial Court issued a warrant to arrest Grabowski and bring him to the penal institution.

Provincial Court Judge Marta Krajewska-Drozd has identified a photograph as depicting

Grabowski.

The United States, in fulfillment of its Treaty obligations to Poland and pursuant to 18

U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for Grabowski's arrest.

Magistrate Judge Merriam issued the arrest warrant, and Grabowski was arrested on August 28,

2020.  Grabowski is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

### I.      LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

#### A.      The limited role of the Court in extradition proceedings

Extradition is a means by which a fugitive is returned to a foreign country, typically

pursuant to a treaty, to face criminal charges or to serve a sentence of imprisonment.  In the United

States, international extradition is primarily an executive function, with a limited role carved out

for the judiciary pursuant to the federal extradition statute.  *See* 18 U.S.C. § 3184.  Pursuant to 18

U.S.C. § 3184, the judicial officer's inquiry is confined to whether (1) the judicial officer is

authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive;

(3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender

is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of

probable cause as to the charges for which extradition is sought.  *See id.*; *Fernandez v. Phillips*,

268 U.S. 311, 312 (1925); *see also Skaftouros v. United States*, 667 F.3d 144, 154-55 (2d Cir.

---

summons to report to the penal institution to serve his sentence.  On April 30, 2003, Grabowski's
father collected the summons and obliged himself to give it to Grabowski.

2011).  "If the judicial officer answers these questions in the affirmative, he or she 'shall certify' the extraditability of the fugitive to the Secretary of State."  *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000) (quoting 18 U.S.C. § 3184).

After a court certifies a fugitive as extraditable, the Secretary of State decides whether the fugitive will be surrendered to the requesting country.  *See* 18 U.S.C. §§ 3184, 3186; *see also, e.g.*, *Lo Duca v. United States*, 93 F.3d 1100, 1103-04 (2d Cir. 1996).  "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch."  *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

### B.      The requirements for certification

#### 1.      Authority of the Court over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  Both magistrate judges and district judges may render a certification under Section 3184.  *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also* Local Rule 72.1(B) ("The Magistrate Judge . . . may also conduct extradition proceedings.").

#### 2.      Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as Grabowski, who is found within its jurisdictional boundaries.  *See* 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under

6

oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension

of the person so charged.").

### 3.      Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever

a treaty or convention for extradition is in force between the United States and the requesting state.

*See, e.g.*, *In re Chan Kam-Shu*, 477 F. 2d 333 (5th Cir. 1973), *cert. denied*, 414 U.S. 847 (1973);

*Hoxha v. Levi*, 465 F. 3d 554, 562 (3d Cir. 2006); *United States ex rel Saroop v. Garcia*, 109 F.

3d 165, 171 (3d Cir. 1997).  The government will satisfy this requirement at the extradition hearing

by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the

U.S. Department of State, attesting that there is a treaty in full force and effect between the United

States and Poland.  The State Department's conclusion that a treaty is in full force and effect is

entitled to deference.  *See, e.g.*, *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts

interpret treaties for themselves, the meaning given them by the departments of government

particularly charged with their negotiation and enforcement is given great weight").

### 4.      Crimes covered by the Treaty

Extradition treaties create an obligation for the United States to surrender fugitives under

the circumstances the treaty defines.  Here, the Treaty provides that the United States and Poland

will extradite to each other, "persons whom the authorities in the Requesting State seek for

prosecution or have found guilty of an extraditable offense."  Treaty Art. 1.  An offense "shall be

extraditable" if (1) "it is punishable under the laws in both Contracting States by deprivation of

liberty for a maximum period of more than one year or by a more severe penalty," *id.* Art. 2(1); or

(2) "consists of an attempt to commit, or participation in the commission of," such an offense, *id.*

Art. 2(2).[3]  In assessing whether the Treaty covers the offense for which Poland seeks extradition, the Court should examine the description of criminal conduct that Poland has provided in support of its charges and decide whether that conduct, if it had been committed here, would be criminal under U.S. federal law, Connecticut law, or the law of a preponderance of the states.  The requesting country need not establish that its crimes are identical to ours.  "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922); *see also, e.g., In re Pena Bencosme*, 341 F. App'x 681, 684 (2d Cir. 2009) (dual criminality requirement satisfied if "the *conduct* of the accused . . . falls within the proscription of American criminal law") (emphasis in original, internal quotation marks and citations omitted).

In fulfilling its function under Section 3184, the Court should construe liberally the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933); *Skaftouros*, 667 F.3d at 155 (2d Cir. 2011); *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (*en banc*) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the

---

[3] Further, an offense is extraditable regardless of whether (a) "the laws in the Contracting States place the offense within the same category of offenses or describe the offense by the same terminology"; or (b) "the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court."  Treaty Art. 2(3).

Court should "approach challenges to extradition with a view towards finding the offenses within

the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

<div align="center">5.      Probable cause that the fugitive has committed the offense</div>

To certify the evidence to the Secretary of State, the Court must conclude that probable

cause exists to believe that Grabowski committed the offenses for which Poland seeks his

extradition. *See, e.g.*, *Cheung*, 213 F.3d at 88. It is well-established that "the function of the

extraditing magistrate is not to decide guilt or innocence but merely to determine whether there is

'competent legal evidence which . . . would justify his apprehension and commitment for trial if

the crime had been committed in that state.'" *Shapiro* v. *Ferrandina*, 478 F.2d 894, 900-91 (2d

Cir. 1973) (quoting *Collins* v. *Loisel*, 259 U.S. at 315); *see also, e.g.*, *Austin*, 5 F.3d at 603 ("[T]he

order of extraditability expresses no judgment on [the fugitive's] guilt or innocence."); *Haxhiaj v.

Hackman*, 528 F. 3d 282, 287 (4th Cir. 2008) ("The extradition hearing is not to serve as a full-

blown trial and serves simply to permit a limited inquiry into the presence of probable cause to

believe that there has been a violation of one or more of the criminal laws of the extraditing

country.") (internal quotation marks omitted).

**C.      An extradition hearing follows unique procedures**

Extradition hearings are neither criminal nor civil proceedings. *See, e.g.*, *Austin*, 5 F.3d at

603 ("We have repeatedly noted, for example, that an extradition hearing is not a criminal

prosecution: the order of extraditability expresses no judgment on Austin's guilt or innocence.").

"By design, 'the procedural framework of international extradition gives to the demanding country

advantages most uncommon to ordinary civil and criminal litigation.'" *Skaftouros*, 667 F.3d at 155

<div align="center">9</div>

(quoting *First Nat'l City Bank v. Aristeguieta*, 287 F.2d 219, 226 (2d Cir. 1960)).  A summary of

those advantages is set forth below.

> 1.  Extradition Hearings Rely on Written Submissions and Do Not Require
>     Live Witnesses

The Federal Rules of Evidence do not apply to extradition proceedings.  *See* Fed. R. Evid.

1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous

proceedings such as extradition or rendition."); *see also, e.g.*, *Skaftouros*, 667 F.3d at 155 n.16.

Hearsay evidence is admissible at an extradition hearing.  *See, e.g.*, *Collins*, 259 U.S. at 317

("unsworn statements of absent witnesses may be acted upon by the committing magistrate");

*Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980) (same); *In re Ryan*, 360 F. Supp. 270, 273

(E.D.N.Y.), *aff'd*, 478 F.2d 1397 (2d Cir. 1973) ("A determination of probable cause in an

extradition proceeding may rest entirely upon hearsay.").   Accordingly, a certification of

extraditability is properly based on the authenticated documentary evidence and information that

the requesting government has provided.  *See, e.g.*, *Harshbarger v. Regan*, 599 F.3d 290, 294 (3d

Cir. 2010) (affidavits of Canadian law enforcement officers are competent and "provided ample

evidence of probable cause"); *Bovio v. United States*, 989 F.2d 255, 259-60 (7th Cir. 1993) (relying

on statement of Swedish investigator); *Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d

1444, 1450-52 (9th Cir. 1987) (relying on affidavit of Canadian prosecutor); *United States v.

Amabile*, 14-M-1043, 2015 WL 4478466, at *9 (E.D.N.Y. July 16, 2015) (stating that "the

certificate of extradition may be based on written statements provided by a foreign prosecutor,

investigator or judge"); *Suyanoff v. Terrell*, No. 12-cv-05115, 2014 WL 6783678, at *8 (E.D.N.Y.

Dec. 2, 2014) ("written summaries of evidence, including witness testimony, are both permitted

and frequently utilized in establishing probable cause within the extradition context"); *In re Extradition of Chan Hon-Ming*, 06-M-296, 2006 WL 3518239, at \*7 (E.D.N.Y. Dec. 6, 2006) (relying on police detective's affirmation setting forth the "major facts and evidence uncovered by the Hong Kong Police").  Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  *See, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Shapiro*, 478 F.2d at 902.

### 2.    Limitations on Fugitives' Defenses in Extradition Proceedings

The fugitive's defenses in an extradition proceeding are heavily circumscribed.  For example, the fugitive has: (i) no Sixth Amendment right to a speedy extradition, *see, e.g.*, *Yapp v. Reno,* 26 F.3d 1562, 1565 (11th Cir. 1994); (ii) no Fifth Amendment guarantee against double jeopardy with respect to successive extradition proceedings, *see, e.g.*, *In re Extradition of McMullen*, 989 F.2d 603, 612-13 (2d Cir. 1993); (iii) no ability to invoke the exclusionary rule, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); (iv) no right to confrontation or cross-examination, *see, e.g.*, *Bingham,* 241 U.S. at 517; *Skaftouros*, 667 F.3d at 155 n.16; (v) no right to invoke defenses that "savor of technicality," *see Bingham,* 241 U.S. at 517; (vi) no right to introduce affirmative defenses, *see, e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 461 (1913); and (vii)  no right to discovery, *see, e.g.*, *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984).

Relatedly, a fugitive's right to present evidence is severely constrained.  "In the exercise of the extraditing judge's discretion, a fugitive may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country."  *Id.*  Accordingly, "evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the Magistrate's hearing."  *Shapiro*, 478 F.2d at 901.

11

"[S]tatements [that] would in no way explain . . . or . . . obliterate the government's evidence, but would only pose a conflict of credibility . . . should properly await trial in [the country seeking extradition]." *Id.* at 905 (internal quotation marks omitted).

### 3.     Rule of non-inquiry

All matters a fugitive might raise as defenses to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186. This is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852); *see also, e.g.*, *Ahmad v. Wigen*, 910 F.2d 1063, 1066-67 (2d Cir. 1990).

## II.     GRABOWSKI SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal prosecution.[4] *See, e.g.*, *Austin*, 5 F.3d at 603; *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 128 (E.D.N.Y. 2001). Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

---

[4] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, and 3156(a)(2). Here, Grabowski is not charged with "offenses" within the meaning of 18 U.S.C. § 3156, but with offenses that violate Polish law.

### A.    Applicable law

1.    <u>A strong presumption against bail governs in an international extradition proceeding</u>

Unlike in domestic criminal cases, courts have long recognized a "presumption against bail in extradition cases."  *Id.*; *see In re Extradition of Rovelli*, 977 F. Supp. 566, 567 (D. Conn. 1997) ("There is a strong, and longstanding, presumption against bail in international extradition proceedings.") (citing *Wright v. Henkel*, 190 U.S. 40 (1903)); *see also, e.g., In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017) ("[T]his is not a criminal case where bail would ordinarily be granted.").  The Supreme Court established this presumption against bail in *Wright*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling.  When, as here, Poland meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive.  *In Re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62.  It is important that the international community regard the United States as a country that honors its agreements, so that the United States will be in a position to demand that other nations

13

meet their reciprocal obligations to the United States. *See e.g., Martinelli*, 263 F. Supp. 3d at 1294

("No amount of money could answer the damage that would be sustained by the United States

were the appellant to be released on bond, flee the jurisdiction, and be unavailable for surrender,

if so determined.") (quoting *Jimenez v. Aristiguieta*, 314 F.2d 649, 653 (5th Cir. 1963)). Such

reciprocity would be defeated if a fugitive flees after being released on bond. Given the United

States' overriding interest, and the presumption against bail, "release on bail in extradition cases

should be an unusual and extraordinary thing." *Borodin*, 136 F. Supp. 2d at 128 (internal quotation

marks and citations omitted).

2. <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be

released on bail unless they meet their burden of establishing (1) that they are not a flight risk or a

danger to the community *and* (2) that "special circumstances" warrant their release. *See, e.g.*,

*Leitner*, 784 F.2d at 160; *Martinelli*, 263 F. Supp. 3d at 1292 ("For over a hundred years . . . circuit

and district courts have . . . applied the 'special circumstances' test for bail determinations in

extradition cases").[5] "This 'special circumstances' standard is much stricter than the 'reasonable

---

[5] Several courts have required fugitives to meet this burden with clear and convincing evidence, reasoning that the presumption against bail in extradition cases justifies a heightened standard of proof, *see, e.g., In re Extradition of Patel*, 08-mj-430, 2008 WL 941628, at *1 (D. Or. Apr. 4, 2008); *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996); others have applied a preponderance of the evidence standard, *see, e.g., Extradition of Santos*, 473 F. Supp. 2d 1030, 1035 n.4 (C.D. Cal. 2006); and still other courts have found it unnecessary to resolve the issue because of the difficulty of satisfying either standard. *See, e.g., Perez-Cueva*, 16-0233, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016).

assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail

Reform Act." *In the Matter of the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

Crucially, the special circumstances inquiry is separate from considering danger to the

community or risk of flight. *See Rovelli*, 977 F. Supp. at 568 ("[The fugitive] must demonstrate

not merely that he is not a flight risk, but that special circumstances exist which justify his being

admitted to bail.") (citations omitted). "Even a low risk of flight" is not a circumstance sufficiently

"unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also, e.g.*, *Borodin*,

136 F. Supp. 2d at 130 (citing cases). Conversely, a fugitive who poses a danger to the community

or a risk of flight should be denied bail, even in the face of special circumstances.

Special circumstances must be extraordinary and not factors applicable to all defendants

facing extradition. *See, e.g.*, *Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts

have considered and rejected a lengthy list of claimed special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271-72 (S.D.N.Y. 1987);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, or ties to the community, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *Rovelli*, 977 F. Supp. at 568; *Duran v. United States*, 36 F. Supp. 2d 622, 628 (S.D.N.Y. 1999); *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1089-90 (C.D. Cal. 2010);

- That the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61;

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Garcia*, 615 F. Supp. 2d at 173-74; *In re Extradition of Hamilton-Byrne*, 831 F. Supp. 287, 290-91 (S.D.N.Y. 1992);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. 2003); *In re Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1072 (C.D. Cal. 2017); *In re Extradition of Knotek*, No. 13-9204, 2016 WL 4726537, at *3, 7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Borodin*, 136 F. Supp. 2d at 127, 131 (State Secretary of the Union of Russia and Belarus); *In re Extradition of Pelletier*, No. 09-22416, 2009 WL 3837660, at *3-4 (S.D. Fla. Nov. 16, 2009) (businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- Availability of electronic monitoring, *see, e.g.*, *Rovelli*, 977 F. Supp. at 569;

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Antonowicz*, 244 F. Supp. 3d at 1070; *In re Klein*, 46 F.2d 85, 85 (S.D.N.Y. 1930);

- The likelihood of success at the extradition hearing, *see Sacirbegovic*, 280 F. Supp. 2d at 88; and

- Availability of bail for the same offense in the requesting country, *see, e.g.*, *Garcia*, 615 F. Supp. 2d at 172.

While, in certain exceptional cases, some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. *See Sacirbegovic*, 280 F. Supp. 2d at 88 (collecting cases). Such findings are highly case-specific and within the Court's discretion, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

**B.    Analysis**

The Court should deny bail because Grabowski poses a flight risk and a danger to the community, and because there do not appear to be any special circumstances that can overcome the strong presumption against bail.

16

Grabowski poses a significant flight risk.  *First*, Grabowski has a history of failing to appear and evading justice.  After being convicted and sentenced for the crimes underlying the extradition request, he fled Poland and failed to surrender to serve his sentence.  Further, because Grabowski has avoided returning to Poland, the Court has reason to surmise that he will continue trying to evade justice.  *See, e.g.*, *United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina,* 536 F.2d 478, 483 (2d Cir. 1976)).  Moreover, now that Grabowski is aware that Poland seeks his extradition from the United States, he has strong incentive to flee further, whether to a third country or to an underground location within the United states.  As noted above, the upcoming extradition proceedings have limited scope and afford Grabowski few rights, and the government's burden to establish extraditability is relatively light.  *See, e.g.*, *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 483 (S.D. Tex. 2010) (finding that a fugitive has "virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof," he faces significant risk of extradition); *In re Extradition of Adame*, Misc. H-13-287, 2013 U.S. Dist. LEXIS 41682, at *7-8 (S.D. Tex. Mar. 25, 2013) (same); *see also, e.g.*, *In re Extradition of Shaw*, No. 14–MC–81475, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he [fugitive] is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee.").  Accordingly, no combination of bail conditions or promises can ensure his appearance before this Court and the

17

United States' ability to fulfill its treaty obligations to Poland.  The flight risk Grabowski poses is, alone, fatal to any bail application.

Grabowski also poses a danger to the community, given the seriousness of the offenses. The Polish court documents reflect that he stands convicted of raping and beating the victim together with another assailant.  This likewise renders bail inappropriate.

However, even if the Court were satisfied that Grabowski poses neither a flight risk nor a danger to the community, the United States is unaware of any "special circumstances" that would justify bail in this case.[6]

## **CONCLUSION**

For the foregoing reasons, the United States requests that Grabowski be detained until the conclusion of the extradition process.

<div style="margin-left:40%">

JOHN H. DURHAM
UNITED STATES ATTORNEY

By: _____

KONSTANTIN LANTSMAN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. phv10692
Konstantin.Lantsman@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT 06510
Tel: (203) 821-3700

</div>

---

[6] Should, however, the Court be inclined to grant bail in this case, the United States respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Government of Poland, the United States also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.