## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **In the Matter of the Extradition of** | : | |
| **Piotr Grabowski a/k/a  Walerek** | : | |
| | : | **3:20-mc-00068-WIG** |
| | : | |
| | : | |
| | : | |
| | : | |

## <u>MOTION FOR RELEASE ON BAIL</u>

Livius Ilasz an attorney at law duly admitted to practice before the courts of the State of New York, moves this Court for Respondent's immediate release from pretrial detention.  Piotr Grabowski (the "Respondent") requests that the Court grant the motion, or, alternatively, hold an emergency hearing on this motion and allow the parties to appear by phone.

This Court should release Respondent on bond pending its examination of Poland's extradition request because "special circumstances" warrant his release, he is neither a flight risk nor a danger to the community, and also in consideration of the global pandemic that has killed hundreds of thousands of people in a short period of time.

At least five special circumstances apply here:

1.  First, Respondent has two substantial, case-dispositive claims against extradition, including (i) lack of probable cause that the Respondent committed any crimes and (ii) the victim recanting her statement and issuing an apology to the Respondent for falsely accusing him of such a heinous offense;

2.   This will be a protracted proceeding. As a result, Respondent faces the specter of a detention period that could last years;

1

3. Respondent has had no criminal history, much less any history of violent crime during his seventeen-year residence in the United States;

4. As the novel coronavirus that causes COVID-19 has spread across the globe, hundreds of thousands of people have been infected and thousands of people have died.[1] There is no known cure. Development of a vaccine is likely at least 12 months away.[2] The federal jail has never confronted a global health pandemic like this one.[3] The facility is unequipped either to prevent transmission of COVID-19 among detainees and staff or to isolate and treat individuals who become infected. For the reasons set forth below, Respondent's ongoing extradition detention poses an imminent threat to Respondent's life and to the health and safety of the community from a deadly infectious disease. Under these unique circumstances, the Court must release Respondent on appropriate conditions, at least until the resolution of this outbreak.

5. Multiple countries within the European Union have declined to uphold any Poland extradition request due to their fear that Poland's Judiciary is no longer fair, unbiased, and/or independent of the government.

---

[1] The World Health Organization has officially classified the spread of Covid-19 as a global pandemic. *See* World Health Organization, Director-General Opening Remarks (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] Saralyn Cruickshank, "Experts Discuss Covid-19 and Ways to Prevent Spread of Disease," John Hopkins Mag. (Mar. 17, 2020), https://hub.jhu.edu/2020/03/17/coronavirus-virology-vaccine-social-distancing-update

[3] Given COVID-19's contagiousness and relatively high death rate, particularly in vulnerable populations, the President ordered a 15-day directive to avoid gatherings in groups of more than 10 people. The President's Coronavirus Guidelines for America, Whitehouse.gov (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

6. The Respondent is applying for political asylum in immigration court for fear that due to political persecution by the local government, courts, and the ineffective assistance of his own counsel he is now barred from filing a subsequent appeal.

With respect to risk of flight, Respondent is not going anywhere. He has a long-time common-law spouse with whom he has two children who reside within the state of Connecticut. Respondent is also the owner of a construction business and has multiple ties to the community. As a show of his commitment to stay and fight extradition, Respondent is presenting this Court with a substantial bond package.

## I. FACTS

Upon information and belief, Maria Trwoga (the "victim") told Polish police the following: On May 16, 2001, in Stare Miasto, she was returning home from shopping. She saw the Respondent and her friend, Ireneusz Zagaja ("Zagaja"). The victim's date of birth is February 12, 1983 and she was age eighteen on May 16, 2001. The victim alleges that she voluntarily got off her bike. After getting off the bike, the victim, Respondent and Zagaja walked the victim's bike to Respondent's property. When they reached the residential building on Respondent's property the victim joined Respondent and Zagaja by sitting on a wall and smoking cigarettes. Upon information and belief, the victim commenced consensual and uncoerced oral intercourse with Respondent. The victim stated to the officials that she was then coerced into a sexual act by Zagaja against her will. According to one of the victim's constantly inconsistent statements Respondent and Zagaja supposedly carried the victim into the building and into a room. Respondent admits that the victim declined traditional intercourse with the Respondent but that the victim willfully performed oral sex on Respondent. Afterwards Respondent exited the room leaving the victim and Zagaja alone. The police later found the victim's watch and underwear in the building which is

consistent with Respondent's statement that the victim was at the location and did have willful oral intercourse with Respondent and unwilful intercourse with Zagaja.

The victim left the building and returned home. When her mother, Janina Janik ("Janik"), questioned the victim's whereabouts the victim initially declined to give her an answer. Only later after Janik's interrogation of the victim's whereabouts did the victim give her mother a concocted story of the above aforementioned events. On May 17, 2001, the following day Janik filed a police report over the phone against the wishes of the victim. Only after Janik called the police station did the police arrive at the victim's home where they took her to the police station. The police then took her to the physician to have a medical checkup. Only after the insistence of her mother and the police did she decide to file a police report against Respondent and Zagaja. As noted in the file the victim later recanted her claims against Respondent and did not wish to further pursue prosecution against Respondent. The prosecutor misinformed the victim and told her that she would be prosecuted for changing her testimony. Only after being coerced by Janik and the police did the victim again change her story and assist in the prosecution of Respondent. The victim during this time has been consistent in wishing not to pursue prosecution against the Respondent. *See* **Exhibit A** (An Affidavit of the alleged victim).

Respondent's attorney at the time of the incident poorly advised the Respondent to plead guilty to a part of the charges despite the complaining witness having attempted to withdraw her statements against the Respondent. His attorney misinformed the Respondent that if he pleaded guilty, he would not receive any imprisonment and would be placed on parole or probation. Subsequently, due to his attorney's poor advice, the Respondent reluctantly pleaded guilty for an offense that he did not commit.

Subsequently, the Provisional Court of Rzeszów unjustly convicted Respondent on October 3rd, 2001 under Article 197 § 3 of the Penal Code and Article 158 § 1 of the Penal Code in connection with Article 11 § 2 of the Penal Code and for this he was sentenced to two years and six months of deprivation of liberty. Pursuant to Article 63 § 1 of the Penal Code the period of an actual deprivation of liberty in the case from May 17, 2001 to October 3, 2001 was credited to the imposed penalty of deprivation of liberty. Respondent's attorney negligently filed an appeal narrowly based upon the sentencing and not the conviction which was a mistake on the part of the attorney. Due to the attorney's mistake he essentially deprived our client from filing an extraordinary complaint based on the merits of the case to the Supreme Court of the Republic of Poland. The Respondent is now barred from filing any further appeals.

## II.    MEMORANDUM OF LAW

A Court may issue a bond in an extradition case if (A) special circumstances warrant the defendant's release; and (B) the defendant is not a flight risk. Both apply here.

### A. Special Circumstances Warrant Respondent's Release

To be entitled to bond, Respondent must prove the existence of "special circumstances." In re Extradition of Ghandtchi, 697 F.2d 1037, 1038 (11th Cir. 1983). Special circumstances include: (1) "the raising of substantial claims upon which the appellant has a high probability of success," Salerno v. United States, 878 F.2d 317, 317 (9th Cir. 1989); (2) the likelihood of "lengthy delays . . . as a result of the actual extradition proceedings themselves and the appeals therefrom," In re Kirby, 106 F.3d 855, 863 (9th Cir. 1996); (3) the fact that the defendant does not have a "prior record" and has not been "charged with a crime of violence," United States v. Taitz, 130 F.R.D. 442, 446 (S.D. Cal. Apr. 20, 1990); and (4) a "serious deterioration in health while in custody." Salerno, 878 F.2d at 317.

5

Although this list is illustrative, it is not exhaustive. Wroclawski v. United States, 634 F. Supp. 2d 1003 (D. Az. 2009) (noting that the court was "not bound by an exhaustive list of 'special circumstances'"). A court may consider other special circumstances as well. Id. Ultimately, "[t]he determination of what [special circumstances] to consider and how much weight to give them is within the 'sound discretion' of the Court." Id. (quoting Beaulieu v. Hartigan, 554 F.2d 1, 1-2 (1st Cir. 1977)); Michael Abbell, Extradition to and from the United States § 4-1 (2010) (noting that judges "have been accorded substantial discretionary latitude" when it comes to the question of what constitutes "special circumstances"). And a court may rely on special circumstances, in the aggregate, to order release. Matter of Extradition of Morales, 906 F. Supp. 1368, 1376 (S.D. Cal. 1995) (relying on four special circumstances to release defendant on bond).

1. **Respondent Did Have Numerous Claims For Appeal With A High Probability Of Success.**

Numerous courts have released a defendant pending an extradition hearing because the defendant presented a substantial claim against extradition. In re Extradition of Huerta, Magistrate No. H-08-342M, 2008 WL 2557514, at *4 (S.D. Tex. June 23, 2008); Matter of Extradition of Gonzalez, 52 F. Supp. 2d 725, 741 (W.D. La. 1999) (same); In re Extradition of Santos, 473 F. Supp. 2d 1030 (C.D. Cal. Dec. 21, 2006) (same); United States v. Ramnath, 533 F. Supp. 2d 662, 665 (E.D. Tex. 2008) (same); Nacif-Borge, 829 F. Supp. at 1216 (same). Here, Respondent has six such claims.

If a defendant is able to show "a substantial likelihood" that "there is no probable cause" that he committed the extraditable offenses, "that may constitute special circumstances justifying bail pending the extradition hearing." In re Extradition of Gonzalez, 52 F. Supp. 2d 725, 737 (W.D. La. 1999).

Here, nothing better demonstrates the lack of probable cause than the victim's inconsistent and coached statements. Initially the victim did not want to tell Janik about the events that occurred on May 16, 2001 but due to her strong insistence, the victim told her a concocted story to denote the Respondent as one of the perpetrators. Janik is the person who initially reported the alleged offense against the victim's wishes. It was after the police and medical staff were involved that the victim was pressured into giving a false statement. Later the victim told the police that Respondent was not involved in the alleged offenses and wished that she could apologize to him for falsely accusing him of such a heinous act.

It is clear that the court in Poland made an erroneous decision based on the inconsistent and pressured statements of a person who later said her statements were false, Janik's statements of what her daughter allegedly told her which is hearsay, and the fact that the victim's watch and underwear were at Respondent's building which is consistent with Respondent's statement.

Again, recently the victim signed a sworn affidavit that she and the Respondent did have consensual sexual contact.  The victim originally was pressured by her mother to make her statement against the Respondent. In the affidavit she also confirms that she attempted to recant her statement on September 7, 2001 but was coerced by the prosecutor not to change her statement or she would be charged with a crime.  After almost two decades the victim maintains that the Respondent is not guilty.

Though it is clear that the court made an erroneous decision, the Respondent is barred from filing another appeal due to the incompetence of his attorney. Respondent's attorney negligently filed an appeal narrowly based upon the sentencing and not the conviction which was a mistake on the part of the attorney. Due to the attorney's mistake he essentially deprived our client from filing an extraordinary complaint based on the merits of the case to the Supreme Court of the

Republic of Poland. The Respondent is now barred from filing any further appeals. Respondent's counsel has filed a motion in Poland to suspend his sentencing for a year due to family hardship and a necessity to prepare his family both emotionally and financially for the prospective imprisonment.

## 2. **The Extradition Process Will Be Lengthy**

Moving to the second special circumstance, courts have released a defendant pending an extradition hearing based on the likely protracted nature of the extradition proceeding. Chapman, 459 F.Supp.2d at 127; Taitz, 130 F.R.D. at 445; In re Extradition of Kapoor, No. 11-M-456 RML, 2011 WL 2296535, at *4 (E.D.N.Y. June 7, 2011). Here, there is no question that we are headed for a protracted fight over extradition for a number of reasons.

First, Poland has produced voluminous materials in support of the Complaint. It will take significant time to review and analyze these materials. Taitz, 130 F.R.D. at 445 (holding likelihood of lengthy proceedings supported release where "[t]he government has submitted to the court a carton containing the exhibits it intends to use at the extradition hearing" and the "exhibits need to be analyzed by the parties and the court before arguments can be made and a decision rendered").

Second, Respondent intends to raise numerous, meritorious challenges to his extradition, some of which are preliminarily discussed above. Kapoor, 2011 WL 2296535, at *4 (holding likelihood of lengthy proceedings supported release where defendant "posited complex and weighty arguments as to why she is not extraditable"); In re Extradition of Sidali, 899 F. Supp. 1342, 1351-52 (D.N.J. 1995) (same); Morales, 906 F. Supp. at 1375 (same);

Third, because of the nineteen-year gap between the time of the alleged offenses and the filing of the Complaint requesting extradition, Respondent will need time to track down and gather the evidence that will prove the falsity of the accusations. Chapman, 459 F.Supp.2d at 127 (holding

likelihood of lengthy proceedings justified release "[b]ecause the underlying offense occurred more than three years ago" and "it may be difficult to track down witnesses and prepare evidence for the hearing").

And fourth, if the Court were to order extradition, Respondent intends to pursue all avenues of relief, including filing a petition of habeas corpus, appealing to the Second Circuit, and requesting relief from the State Department. Taitz, 130 F.R.D. at 445 (holding likelihood of lengthy proceedings justified release where "resolution of this issue will no doubt involve habeas corpus proceedings in the district court and the Court of Appeals" and "would likely last for as long as two years"); Kapoor, 2011 WL 2296535, at *4 (same).

### 3.  Respondent's Lack Of Criminal History And Nature Of The Charges

Another recognized special circumstance is where a defendant "has no prior record and is not charged with a crime of violence." Taitz, 130 F.R.D. at 446; see Chapman, 459 F.Supp.2d at 1026; Nacif-Borge, 829 F.Supp.2d at 1220-21. Respondent has no criminal history whatsoever. Respondent acknowledges that his unjust conviction is violent in nature but the victim has acknowledged that Respondent was not a bad actor in the occurrence.

### 4.  Detention Will Result In A Serious Deterioration In Respondent's Health Due To A Global Pandemic

Another special circumstance justifying release here is Respondent's health amid a global pandemic that has killed hundreds of thousands of people worldwide. See Taitz, 130 F.R.D. at 446; Sidali, 899 F. Supp. at 1351-52; See Huerta, 2008 WL 2557514, at *4. On March 11, 2020, the World Health Organization declared a global pandemic.[4]  Citing "deep[] concern[] both by the alarming levels of spread and severity, and by the alarming levels of inaction," it called for

---

[4] See supra note 1.

countries to take "urgent and aggressive action." The Governor has declared a Public Health Emergency identifying COVID-19 as an imminent threat to the health and safety of the community, requiring emergency protective actions.   Since then, normal life has ceased. Businesses, restaurants, schools, government offices, and churches are closed.  People who have control over their bodies are self-isolating to prevent contracting or spreading this deadly disease. As of September 3, 2020, 6.6 million people have been diagnosed with COVID-19 in the United States, with over 187,000 deaths confirmed.[5]

The number of people infected is growing exponentially. The death toll in Italy, which began experiencing this epidemic about a week earlier than the first diagnosed American case, saw a rise of 30% overnight in the 24 hours between March 5, 2020, and March 6, 2020 and a rise of 25% on March 15 alone—a day that killed 368 people in Italy.[6] Experts predict similar rapid growth in the United States.  The numbers of people diagnosed reflect only a portion of those infected;[7] very few people have been tested, and many are asymptomatic transmitters.[8]  Thousands of people are carrying a potentially fatal disease that is easily transmitted—and few are aware of it.

---

[5] Centers for Disease Control, Coronavirus 2020, https://covid.cdc.gov/covid-data-tracker/?utm_source=morning_brew#cases

[6] "Italy coronavirus deaths near 200 after biggest daily jump," Crispian Balmer & Angelo Amante, Reuters (Mar. 6, 2020), https://www.reuters.com/article/us-health-coronavirus-italy/italy-coronavirus-deaths-near-200-after-biggest-daily-jump-idUSKBN20T2ML.

[7] Melissa Healy, "True Number of US Coronavirus Cases is Far Above Official Tally, Scientists Say," L.A. Times (Mar. 10, 2020), https://www.msn.com/en-us/health/medical/true-number-of-us-coronavirus-cases-is-far-above-official-tally-scientists-say/ar-BB110qoA.

[8] Roni Caryn Rabin, "They Were Infected with the Coronavirus. They Never Showed Signs," N.Y. Times (Feb. 26, 2020, updated Mar. 6, 2020),  https://www.nytimes.com/2020/02/26/health/coronavirus-asymptomatic.html; Aria Bendix, "A Person Can Carry And Transmit COVID-19 Without Showing Symptoms, Scientists Confirm,", Bus. Insider (Feb. 24, 2020), https://www.sciencealert.com/researchers-confirmed-patients-can-transmit-the-coronavirus-without-showing-symptoms.

The current estimated incubation period is between 2 and 14 days.[9] Approximately 20% of people infected experience life-threatening complications, and between 1% and 3.4% die.[10] The virus is thought to spread through respiratory droplets or by touching a surface or object that has the virus on it.[11] Thus, infected people—who may be asymptomatic and not even know they are infected—can spread the disease even through indirect contact with others.

Accordingly, officials and experts urge "social distancing"—isolating oneself from other people as much as possible.[12] Social distancing is virtually impossible inside the federal jail. Other federally recommended precautions include frequent hand-washing, alcohol-based hand sanitizers, and frequent cleaning *and* disinfecting of any surfaces touched by any person.[13]

It is virtually impossible to engage in these basic preventive measures in federal jail. During pandemics, jail facilities become "ticking time bombs" as "[m]any people crowded together, often suffering from diseases that weaken their immune systems, form a potential breeding ground and reservoir for diseases."[14] As Dr. Jaimie Meyer, an expert in public health in jails and prisons, recently explained, "[T]he risk posed by COVID-19 in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected." *See* Exhibit 1, Declaration of Dr. Jaimie Meyer ("Meyer Decl.") ¶ 7 (Mar. 15, 2020). This is due to a number of factors; the close proximity of individuals in those facilities,

---

[9] "Coronavirus Disease COVID-19 Symptoms," Centers for Disease Control (updated: Feb. 29 2020), https://www.cdc.gov/coronavirus/2019-ncov/about/symptoms.html.
[10] Vox, *Why Covid-19 is worse than the flu, in one chart*, https://www.vox.com/science-and-health/2020/3/18/21184992/coronavirus-covid-19-flu-comparison-chart.
[11] Centers for Disease Control, Coronavirus Factsheet (Mar. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.
[12] *See supra* notes 2 & 3.
[13] Centers for Disease Control, Steps to Prevent Illness: https://www.cdc.gov/coronavirus/2019-ncov/about/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fabout%2Fprevention-treatment.html; *see also supra* notes 2 & 3.
[14] *See* Saint Louis University, "Ticking Time Bomb," *Prisons Unprepared For Flu Pandemic*, ScienceDaily (2006), https://www.sciencedaily.com/releases/2006/09/060915012301.htm.

their reduced ability to protect themselves through social distancing, the lack of necessary medical and hygiene supplies ranging from hand sanitizer to protective equipment, ventilation systems that encourage the spread of airborne diseases, difficulties quarantining individuals who become ill, the increased susceptibility of the population in jails and prisons, the fact that jails and prisons normally have to rely heavily on outside hospitals that will become unavailable during a pandemic, and loss of both medical and correctional staff to illness. *Id.* ¶¶ 7-19.[15]

When coronavirus suddenly exploded in China's prisons, there were reports of more than 500 cases quickly spreading across five facilities in three provinces.[16] In Iran, 54,000 prisoners were temporarily released to protect them and to protect the community from propagation of an outbreak.[17]

People incarcerated at the jail:

    a. Are typically housed in close proximity to others and unable to distance themselves;

    b. Spend significant time in communal spaces, such as eating areas, recreation rooms, bathrooms, and cells or holding areas, and they are unable to choose to do otherwise;

    c. Live in spaces with open toilets within a few feet of their beds, and unable to access a closed toilet that would not aerosolize bodily fluids into their living spaces;

    d. Are constantly within six feet of other people, likely none of whom have been tested for COVID-19, and they are unable to choose to do otherwise;

    e. Must physically touch others or be touched by others, such as correctional officers and medical staff, many of whom have not been tested for COVID-19, and they are unable to opt out of this contact;

---

[15] "The pathway for transmission of pandemic influenza between jails and the community is a two-way street. Jails process millions of bookings per year. Infected individuals coming from the community may be housed with healthy inmates and will come into contact with correctional officers, which can spread infection throughout a facility. On release from jail, infected inmates can also spread infection into the community where they reside." *Pandemic Influenza and Jail Facilities and Populations,* American Journal of Public Health, October, 2009; *See also* Dr. Anne Spaulding, Coronavirus and the Correctional Facility: for Correctional Staff Leadership, Mar. 9, 2020, https://www.ncchc.org/filebin/news/COVID_for_CF_Administrators_3.9.2020.pdf

[16] Claudia Lauer & Colleen Long, "US prisons, jails on alert for spread of coronavirus," AP News (Mar. 7, 2020), https://apnews.com/af98b0a38aaabedbcb059092db356697.

[17] *Id.*

      f.  Are frequently subjected to intimate contact by correctional staff, many of whom have not been tested for COVID-19, during searches of their person, including having those staff place their hands inside of people's mouths and other body cavities;

      g.  Lack recommended access to soap, water, tissues, and paper towels;

      h.  Lack access to hand sanitizer that complies with CDC guidelines.

People in the jail also lack access to quality, efficient medical care. Although an incarcerated person can request to see a member of the medical staff, those requests take significant time to process.

This combination of lack of adequate sanitation, close quarters, and limited medical capacity create an intolerably dangerous situation, putting detainees, jail staff, and the communities they belong to at greater risk of illness and death—without any compelling need. The constant cycling of people in and out of the jail[18] makes containment impossible, even if visitations are stopped.[19]

Science shows that, within jails and prisons, isolation, segregation, and lockdown are ineffective against COVID-19, Meyer Decl. ¶ 10, and regardless, the jail does not have the physical space to accomplish these efforts for the current jail population. COVID-19 can survive in the air, so separation in a facility where there is still other movement of people, and occasional interaction, will not contain it. Surfaces are still touched–inside cells, in bathrooms, and in transport, at the very least. Further, the reality is that some contact with others, whether through close proximity or actual contact, is inevitable. Kitchen staff, intake staff, officers and medical staff all interact with incarcerated people as a matter of course, even on lockdown.

---

[18] *See Peter Wagner & Emily Widra*, "No need to wait for pandemics: The public health case for criminal justice reform," Prison Policy Initiative (Mar. 6, 2020), https://www.prisonpolicy.org/blog/2020/03/06/pandemic.

[19] Premal Dharia, "The Coronavirus Could Spark a Humanitarian Disaster in Jails and Prisons," Slate (Mar. 11, 2020), https://slate.com/news-and-politics/2020/03/coronavirus-civil-rights-jails-and-prisons.html

Respondent is a 42-year-old man who is in poor physical and mental health. Given his age and poor health, the stress of a prolonged detention will almost surely result in a serious deterioration of Respondent's health. *See* Taitz, 130 F.R.D. at 446 (holding that defendant's allergic reactions to the food and soap at the detention center qualified as a special circumstance supporting release).

If Respondent is released, he will remain confined to his home with the exception of only leaving his home for medical appointments and court appearances. In Dr. Meyer's words, "[r]educing the size of the population in jails and prisons is crucially important to reducing the level of risk both for those within those facilities and for the community at large." Meyer Decl. ¶ 37. In this unique moment, release *enhances* the safety of other people and the community—and is necessary to protect Respondent's own health and safety. Respondent must be able to exercise self-protective measures in a sanitary, disinfected space, and to maintain social distance from other community members to flatten the curve of the virus's spread.

## 5. Multiple Countries Within The European Union Have Declined To Uphold Any Poland Extradition Request Due To Their Fear That Poland's Judiciary Is No Longer Fair, Unbiased, And Or Independent Of The Government.

Several countries in the European Union including the Netherlands, Germany, and the United Kingdom have rejected multiple Poland extradition requests due to fears of unfair trials. In 2019, Germany's Karlsruhe Higher Regional Court issued a press release expressing concern about judicial independence in Poland and stating that it would decline Poland's extradition request. In 2020, Poland's president signed into law the Muzzle Law which is aimed at disciplining

judges who question government judicial reforms, which has been highly criticized within the European Union.[20]

In 2018, the United Kingdom's highest court declined to extradite a man who had been convicted of drug offenses and sentenced to two years. The man served eighteen months but was released. While released the man fled Poland and went to the United Kingdom. The man had served over 75% of his original sentence and paid restitution to his alleged victim. Given these circumstances, the English judge found that extradition to Poland in 2018 for low-level offenders committed years before would be a disproportionate interference with the appellant's right to private and family life.[21]

The court should take into consideration the European Union concern with regards to Poland's judicial fairness and refuse to extradite the Respondent. The client served a significant portion of his initial sentence and has lived a lawful and productive life in the United States.

## 6. The Respondent Is Applying For Political Asylum In Immigration Court For Fear That Due To Political Persecution He Will Be Unable To Receive A Fair Due Process.

The Respondent is seeking political asylum for fear that he will continue to be the victim of political persecution by the local government. At the time of the incident multiple local courts were closing in Poland due to a low volume of crime. In 2002, The Employment Law Division of the District Court in Lezajsk was closed. Also, in 2002, the Petty Crime Court closed in Poland as well. In Poland, there are sometimes Petty Crimes Courts formed as a subdivision of the Criminal

---

[20]Jasmin Bauomy, *Germany refuses to extradite Pole under European arrest warrant due to fair trial fears*, Euro News (2020), https://www.euronews.com/2020/03/09/germany-refuses-to-extradite-pole-under-european-arrest-warrant-due-to-fair-trial-fears (last visited Sep 22, 2020).
[21] UK court rejects disproportionate European Arrest Warrant to Poland, Fair Trials (2018), https://www.fairtrials.org/news/uk-court-rejects-disproportionate-european-arrest-warrant-poland (last visited Sep 23, 2020).

Court Division in some District Courts. Both the Employment Law Division and Petty Crimes Courts were shut down because of the small case inflow.

At the time of the incident, the Provisional Court of Lezajsk was allegedly at risk of being shut down due to a small case inflow. If the local court would have shut down many members of law enforcement, prosecutors, and court employees would have become unemployed. The Respondent's case was handled by the Prosecutor's Office in Lezajsk which is the seat of the Court in Lezajsk that was at risk of being shut down. This may have been the motivation for the local prosecutor in Lezajsk, law enforcement and courts to conspire and work in unison to suppress the victim's truthful testimony and to unjustly coerce the victim into lying under oath by threatening to prosecute the victim. Respondent's own attorney's questionable actions seem to confirm that he was only motivated in providing work for the local prosecutor and court and not in the best interest of his client. Respondent fled Poland due to clear and convincing evidence that his conviction and appeal were politically motivated and not based on truthful testimony or evidentiary facts.

If Respondent is extradited back to Poland, he will continue to be the victim of political persecution by the local officials by having to serve a term of imprisonment for an offense that 1) he did not commit, 2) was politically motivated, and 3) was primarily caused by the ineffective assistance of counsel, or worse. Respondent is barred from appealing his conviction due to the mistakes of his attorney. The only relief he could seek would be to request time to get his affairs in order before he is incarcerated because he is this sole provider for his family and he has a child with a severe speech and hearing disability. This political persecution would not only victimize the Respondent but his family as well.

**B.  Respondent is not a Flight Risk**

      1.  <u>Respondent's Past Behavior Proves He Is No Flight Risk</u>

Poland's filing of an extradition request did not come as a surprise to anyone. Respondent did nothing to hide for 17 years.  Now the Government would have this Court believe that, if the Court gives Respondent a bond, he will decide the time is ripe to execute his escape from the United States. Such a position fails the common-sense test. If Respondent was going to flee this country, he would have done so a long time ago.

2.   Respondent's Ties to the Community Prove That He Is No Flight Risk

Numerous courts have released a defendant facing extradition based on the defendant's substantial ties to the community. Kapoor, 2011 WL 2296535, at *5; Chapman, 459 F. Supp. 2d at 1027. There is no question that such ties exist here.

The Respondent has family, including a common law wife, two children, a sister, close friends, and supporters in Connecticut. *See* **Exhibit B**. Respondent has owned a business in Connecticut for over a decade and maintains two homes in Connecticut. Respondent and his family are active members of Sacred Heart Church located in Greenwich, Connecticut. *See* **Exhibit C**. Respondent also has nowhere else to go. In short, Respondent is rooted to this community and these roots provide an ample basis for ordering release. Chapman, 459 F. Supp. 2d at 1027 (ordering release of three Hawaii-based defendants facing extradition and noting that the defendants had "households, children and significant financial interests in Hawaii"); Kapoor, 2011 WL 2296535, at *5 (ordering release of New York-based defendant facing extradition because defendant's children, husband, and father lived in New York City).

3.   Respondent's Proposed Bond Package Guarantees His Appearance

To prove to the Court that he is committed to remaining in the United States, Respondent has put together a bond package that is well on par with other bond packages. The key terms of the package are set out in bullets below:

- $1,000,000 10% bond, co-signed by Respondent's sister and backed by equity in Respondent's two properties;

- Home confinement in Respondent's primary Connecticut home;

- Electronic monitoring;

- Whatever restrictions of access to modes of transportation (e.g., planes, boats, etc.) the Court deems fit; and

- An executed waiver of extradition that would become operative if the Respondent should flee the Court's jurisdiction.

To help put these bond terms in perspective, the Court should consider the Arias Leiva case, a case arising out of this district. There, Judge O'Sullivan released the defendant on a $1,000,000 personal surety bond that was co-signed by a United States citizen and secured with real property having equity of at least $1,000,000, along with a condition of electronic monitoring. *In the Matter of the Extradition of Arias Leiva,* Case No. 16-23468-MC-O'Sullivan (S.D. Fla. Feb. 6, 2017). Unlike Arias Leiva, Respondent has continuously maintained a residence in the United States for decades which makes Respondent a markedly less significant flight risk. Respondent's proposed bond package is well on par with the package that Judge O'Sullivan approved in Arias Leiva.

### 4.   Because Respondent Is Not A Flight Risk, Due Process Requires His Release

As held in Paretti v. United States, 122 F.3d 758 (9th Cir. 1997), if Respondent is not a flight risk, and he clearly is not, the Court must release him under the United States Constitution's Due Process Clause. The court wrote: "[U]ntil such time as an individual is found to be extraditable, his or her Fifth Amendment liberty interest trumps the government's treaty interest

unless the government proves to the satisfaction of the district court that he or she is a flight risk." Id.

Although the Paretti opinion was ultimately withdrawn, and the appeal dismissed on other grounds, 143 F.3d 508 (9th Cir. 1998) (en banc), the opinion's due process analysis remains sound and applies here. Because Respondent is not a flight risk, due process requires his immediate release.

In closing, Respondent wishes to address what he expects to be a cornerstone of Poland's argument for detention, specifically, the Supreme Court's dated holding in Wright v. Henkel, 190 U.S. 40 (1903), that bail should not ordinarily be granted in extradition cases. Putting the due process argument aside, numerous courts have recognized the erosion of Wright's so-called "presumption" of detention. Beaulieu v. Hartigan, 430 F. Supp. 915, 916 & n.2 (D. Mass. 1977) (concluding that "[i]n the more contemporary reported cases, granting of bail pending completion of the extradition proceedings has been the rule rather than the exception"); Molnar, 182 F. Supp. 2d at 688; United States v. Messina, 566 F. Supp. 740, 744-45 (E.D.N.Y. June 24, 1983); Abbell, Extradition to and from the United States § 4-1 ("[T]he special circumstances test is simply 'irrelevant' to the government's concern, and an anachronism based on insufficiently considered and deified dicta in a hundred year old Supreme Court opinion."). This liberalization on the bail issue is reflected not just by the numerous cases that Respondent has already cited in this motion, but also by cases from this very district. See, e.g., In re Extradition of Nandwani, 07-MC23253-Dube, DE:24 (8 Jan 2008) ($100,000 ten-percent bond, $500,000 personal surety bond, and $50,000 corporate surety bond); In re Extradition of Villatoro-Monteagudo, No. 06-MC-20469-Dube, DE:22 (S.D. Fla. 18 Dec 2007) ($200,000 personal surety bond); In re Extradition of Sepulveda-Mery, No. 05-CV-22648-O'Sullivan, DE:16, DE:20 (S.D. Fla. 2 Dec 2005) ($500,000

ten-percent bond); In re Extradition of Rauit, No. 04-MC-20093-Bandstra, DE7 (S.D. Fla. 12 Feb 2004).

In short, Wright is a 100-plus-year-old decision whose rationale is outdated in this modern age. Courts today can impose conditions on released defendants that, to the justices on the Wright court, would have been the stuff of science fiction, including 24/7 electronic monitoring that pinpoints a defendant's precise location and alerts authorities at any sign of a problem. And in this post 9-11 world, international and domestic travel is heavily regulated and surveilled. In sum, the Government can no longer blindly rely on Wright under the current case law and in this modern age. The Wright presumption is rebuttable and has been rebutted.

### III. CONCLUSION

For the foregoing reasons, the Court should grant Piotr Grabowski's immediate release.

Dated: October 27,2020

Respectfully submitted,

*/s/  Livius Ilasz*
Livius Ilasz
PHV10920
Ilasz & Associates
One Maiden Lane - 9th Floor
New York, New York 10038
Phone: (212) 480- 2222
Fax: (212) 480- 2958

## CERTIFICATE OF SERVICE

This motion was filed electronically on October 27, 2020 through CM/ECF and served on Konstantin Lantsman Esq., Sarala Vidya Nagala Esq., Tracy Hayes Esq., Chester John Bukowski Jr. Esq., through that system.

_s/  Livius Ilasz_
Livius Ilasz